ELIZABETH McCLELLAN, Appellant, *v.* SAM DAVID, dba DAVID FOOD PRODUCTS, Respondent.

No. 5420

April 17, 1968          439 P.2d 673

[Rehearing denied June 19, 1968]

*Foley, Garner & Shoemaker,* of Las Vegas, for Appellant.

*Wiener, Goldwater & Galatz* and *J. Charles Thompson,* of Las Vegas, for Respondent.

## OPINION

By the Court, Collins, J.:

Appellant (plaintiff below) sued respondent (defendant below) for $53,000 damages for personal injuries resulting

from use of a cleaning product called "Sparkle," prepared, mixed and sold by him in Clark County Nevada. Respondent defaulted in answering the complaint and judgment was rendered against him by the trial court for $7,800 after hearing plaintiff's proof. Relief from the judgment was granted to respondent by the lower court in setting aside his default and allowing him to defend. We reverse that order and reinstate the judgment, for the reason that no excusable neglect was shown as a matter of law.

The action was commenced May 14, 1965. Summons and complaint were served upon respondent by leaving a copy at his home with his wife. (NRCP 4(d)(6)).

The complaint alleged that appellant had been injured by the use of the product in 1963. Respondent, who had sold his business to Interstate Restaurant Supply Co. in 1964, forwarded the complaint and summons to his purchaser. He did this rather than retaining counsel or seeking advise upon the matter because he felt it was the purchasers obligation to defend the action.

No pleadings having been filed by or on behalf of respondent, his default was entered June 25, 1965. The lower court received appellant's ex parte proof December 15, 1966, and entered judgment in her favor for $7,800 and costs. No explanation appears in the record for the lapse of 18 months between the entry of default and the prove-up of damages.

Respondent's first motion to set aside the default was made on March 28, 1967 on the ground that effective service of process was not made resulting in the lack of jurisdiction of the lower court to enter the judgment. David contended in an affidavit he had no knowledge or notice of the proceedings until February, 1967. This motion was denied when service of process on David's wife in May, 1965 was proved and finally admitted.

A second motion (with court approval) was made by respondent to set aside the default on the ground that defendant's failure to file an answer was the result of his "inadvertence, surprise and excusable neglect." The motion was accompanied by a proposed answer which alleged a general denial and several affirmative defenses on behalf of David but which did not seek to interplead Interstate Restaurant Supply Company as the real party defendant. David's affidavit accompanying the motion was supported by a letter from a Mr. Marvin Rubin, of Fuld Bros. Inc. to Mr. Sam Horowitz of Interstate Restaurant Supply Company to whom David had sent the summons and complaint, acknowledging their receipt, and forwarding them on to the insurance carrier; and another

letter from Fuld Bros. to Alexander and Alexander of Baltimore, Maryland, asking handling of the case through Travelers Insurance Company. This motion was granted and it is from such order this appeal is taken.

A transcript of the hearing on the latter motion is a part of the record in this case. That transcript reveals Sam David was called as an adverse witness by appellant and questioned upon the subject of telephone calls made by him to the office of appellant's counsel after commencement of the action in 1965. He testified as follows:

"Q. Now, as I understand your testimony then, you don't recall whether you called the offices of Mendoza, Foley and Garner or not, is that correct?

A. I only recall the one instance that I mentioned.

Q. Is it possible you did call the office after you were served with this complaint?

A. It is possible, but I don't recall it. I don't know what you're referring to, sir."

In opposition to David's testimony, appellant called as her witness Henrietta Troxel, a secretary in the office of Foley, Garner & Shoemaker, attorneys at law, and counsel for appellant. On the same subject matter of telephone conversations with David about this litigation, she testified, after refreshing her memory from notes made by her at the time of the occurrences, as follows:

"Q. Now, since May 18th, 1965, have you had any telephone calls or any conversations with any persons in regard to this particular complaint?

A. I have had at least three telephone conversations with Mr. David.

Q. With whom, ma'am?

A. Mr. David; Sam David.

Q. Would you tell us when these conversations occurred, if you can recollect?

A. The first one was either the next day or the day following after service had been—the complaint had been served on him, he called, and wanted to speak to Mr. Garner and I informed him that Mr. Garner would probably not speak to him.

Q. Now, just a minute, Mrs. Troxel. Would you tell the court how you knew or how you were able to determine that this was Mr. David rather than some other person?

A. He told me 'This is Sam David from David Food Products; you have a complaint against me; who is Elizabeth McClellan? Why is she suing me? I don't know her.'

Q. What occurred then, in this conversation?

A. Mr. David wanted to know why Mrs. McClellan was suing him. I told him to look at the complaint. He was reading from the complaint and denying it. I told him he would have to get his own attorney to call Mr. Garner; that Mr. Garner would probably not speak to him.

Q. Did you ever subsequently have another conversation with him where this person at least identified himself as Mr. Sam David?

A. He called again and insisted on speaking to Mr. Garner.

Q. When was this, Mrs. Troxel?

A. Oh, this was just a few days after that. I don't know, but I believe I have notations in the file, I usually date my notes.

Q. Did you subsequently have another conversation at a later date with Mr. David?

A. Mr. David called me up the early part of this year [1967] and told me that he had an escrow with some title company and he then discovered that there was a judgment against him. No, previous to that, I called Mr. David up and informed him that default would be taken against him if he did not answer."

On the same subject, after first examining her note in the file, she testified as follows:

"BY THE WITNESS: This is a note where I called Mr. Sam David at 735–9041. I believe this is at his place of business. * * * It's dated 6/9/65. It's in my handwriting and I said— I told him to get his answer—

BY THE COURT: What was the date?

BY MR. SHOEMAKER: 6/9/65, I believe, isn't that correct?

BY WITNESS: Yes.

BY MR. SHOEMAKER: Q. What date was that, Mrs. Troxel?

A. The 9th day of June.

Q. 1965?

A. 1965.

Q. All right, what occurred and what is now your recollection after having read this note?

A. Well, Mr. David had still not answered and so I called him to remind him that there was the twenty-day period of time in which he had to get his answer. He told me that he had called the manufacturer, that he wanted the manufacturer to answer, that he was not responsible. So I told him, 'Well, either call your attorney, your insurance carrier or someone and get your answer in.' He told me, 'I called him once and I'm going to get on this immediately. I'm going to call him just as soon as I talk to you.'

Q. Now, Mrs. Troxel, you had an additional telephone call sometime in early February, 1967 from Mr. Sam David, is that correct?

A. Yes.

Q. And you have also heard him testify up here?

A. Yes.

Q. Would you relate to the Court whether or not you could or would reasonably be able to recognize his voice.

A. As a matter of fact, I recognized his voice when he called me in February. I remember voices over the telephone and he told me that he had an escrow and at that time he discovered the judgment against him. He said, 'What is this judgment about? I don't know a thing about it.' And so I said, 'Mr. David, I have spoken to you at least three times about this matter.' He said, 'It's all new to me.' I said 'Mr. David, I have notes in the file to show that I spoke to you.' So then he wanted to speak to Mr. Garner again and at that time I told him Mr. Shoemaker was now handling the matter and I don't believe there is anything to talk about."

Appellant contends the lower court abused its discretion in setting aside the default in that respondent failed to show excusable neglect. She argues that the showing fails in the following respects: (1) inaction for 18 months; (2) ignoring of the command in the summons, and warnings given through appellant's counsel to answer timely; (3) unilateral, subjective reliance without just or probable cause from appellant or from anyone else that a third party would defend the action; (4) failure to interplead in his tendered answer the third party whom respondent felt was obligated to defend the action on his behalf.

Respondent, on the other hand, convinced the lower court of his "excusable neglect" by urging: (1) reasonable reliance upon a third party to defend the case; (2) apparent belief by the lower court of David's testimony over that of Mrs. Troxel as to the fact and substance of telephone conversations between them about this litigation; (3) affidavit of his counsel that upon being retained by David after default judgment was entered they worked diligently to determine the status of the litigation, and took action immediately to set aside the default and that respondent in their opinion had a meritorious defense to the cause of action.

From the record there was substantial evidence to show neglect on the part of David. However, before a default judgment may be set aside under NRCP 60(b)(1), the party so moving must show to the court that his neglect was excusable.

Intermountain Lumber v. Glens Falls Ins., 83 Nev. 126, 424 P.2d 884 (1967); Nevada Industrial Guaranty Co. v. Sturgeon, 80 Nev. 254, 391 P.2d 862 (1964); Anderson v. Taylorcraft, Inc., 197 F.Supp. 872 (W.D.Pa. 1961). We hold, as a matter of law, that respondent did not make such a showing.

Respondent David stated that he felt that Interstate Restaurant Supply Co. was obligated to defend the action and that he relied heavily upon that subjective feeling. He did not, however, produce anything to demonstrate his reliance was based upon anything but his own state of mind. The letters from Fuld Bros. certainly indicate nothing more than an effort to bring the claim to the attention of the Travelers Insurance Company with the hope it would settle the case or defend it. Travelers Insurance Company did neither, nor is there the slightest indication it ever intended to.

If respondent's reliance was predicated upon the contract of sale he had with Interstate, whereby they agreed to hold him harmless from this type of liability, he failed to produce it. The conclusive factor in this regard is his failure to interplead Interstate in the answer he did file with the court. His answer contains only general denials and affirmative defenses with no mention of any kind of liability of Interstate.

The factor shown by the record which should have prompted the trial judge to deny the motion was the telephone conversations between the respondent and Mrs. Troxel. Mrs. Troxel, as related above, distinctly recalled three telephone conversations with David about this litigation. Two of the conversations occurred before entry of default; one on June 9, 1965, when he called her employers office, and one later conversation when she called him to urge him to file his answer.[1] Her recollection of the conversations were refreshed from notes made by her at the time. Her testimony was not impeached in the slightest. David did not deny these conversations. He simply said he did not recall them. Accordingly, there is not fundamental conflict in this testimony requiring us to adhere to the trial court's finding in favor of respondent on this issue. State v. V. & T. R. R. Co., 23 Nev. 283, 292, 46 P. 723 (1896); Washington National Ins. Co. v. Benz, Inc., 382 P.2d 678, 681 (Ariz. 1963). Testimony of a witness that he does not remember whether a certain event took place does not contradict positive testimony that such event or conversation took place. Bender

---

[1]The third followed the entry of judgment when David called to inquire why there was a lien upon his property. This call was admitted by him.

v. Roundup Mining Co., 356 P.2d 469, 471 (Mont. 1960); Tennent v. Leary, 304 P.2d 384, 387 (Ariz. 1956). See also: Comment Note—Comparative value of positive and negative testimony, 98 A.L.R. 161. Therefore, we hold that there was no credible evidence before the lower court to show that the neglect of respondent David was excusable under the circumstances.

Very recently we have had occasion to consider this same problem. In Lentz v. Boles, 84 Nev. 197, 438 P.2d 254 (1968), all the Nevada cases on setting aside defaults were reviewed, those reasons supporting or defeating the exercise of discretion were discussed and a ruling made that we favored adjudication of cases upon their merits. But we also urged judicious, explicit and carefully reasoned exercise of that discretionary power when we said, "We wish not to be understood, however, that this judicial tendency to grant relief from a default judgment implies that the trial court should always grant relief from a default judgment. Litigants and their counsel may not properly be allowed to disregard process or procedural rules with impunity. Lack of good faith or diligence, or lack of merit in the proposed defense, may very well warrant a denial of the motion for relief from the judgment."

We have found it exceedingly difficult to set down generalized rules for guidance of the lower courts in proper exercise of their discretion in setting aside default judgment. Fact patterns urged for the exercise of that discretion are so varied that the emergence of a clear definition of "excusable neglect" can only come on a case by case basis. Even then our own pronouncements may be said to stultify rather than clarify the problem.

We cannot forget, however, that for the sake of continuous, regular and predictable flow of legal business we must give the rules of procedure, including the right to take a default after proper service of process, reasonable, flexible interpretation. But lines must be drawn somewhere and litigation brought to an end by final judgment, even though obtained by default.

Accordingly, we reverse the order of the lower court setting aside the default of respondent and reinstate the judgment of $7,800 plus costs dated December 23, 1966.

BATJER and MOWBRAY, JJ., concur.

ZENOFF, J., dissenting:

From the very beginning of Nevada's judicial time this court directed that the case would have to be "extreme" before the court would reverse an order setting aside a default. Howe v.

Coldren, 4 Nev. 171, 175–176 (1868). The recapitulation in Hotel Last Frontier Corp. v. Frontier Properties, Inc., 79 Nev. 150, 380 P.2d 293 (1963), confirms steady adherence to that principle. Whenever the fact pattern included nonattorney neglect, a reasonable explanation by the layman-litigant of why he did not respond to a complaint, and prompt action plus a meritorious defense, the exercise of discretion by the trial court to allow the litigant his day in court was upheld. "If," the court said, "there is a refusal to set aside a default, a ruinous judgment may be sustained against a party who, upon hearing might have interposed a perfectly good defense. By sustaining the default, he would forever be debarred the right of a hearing. If, then, a nisi prius court refuses to set aside a default when a party shows with reasonable certainty that he has a good defense, and he has only been guilty of carelessness and inattention to his business, but no willful or fraudulent delay, it would be highly proper even for an appellate court to come to his relief if the lower court refused it. But when the default has been set aside the case is far different. In such case, if the plaintiff has a good cause of action and clear proof of his demand he could generally try his case in the court below and obtain another judgment in less time, and with far less expense, than he could bring his case to this court. In fine, if the plaintiff has a good case there is no necessity of appealing. If he has a bad one, this court ought not to be very anxious to help him keep an advantage he has obtained, not through the justice or strength of his cause, but by the accidental blunder of his opponent.

"It appears to us it would have to be an extreme case, when this court would reverse an order setting aside a default." Howe, supra.

The record shows understandable neglect on the part of David. Having sold his business, any lawsuits were the concern of the new owners so far as he understood. When the complaint was served on him David notified the owners and they, in turn, notified the insurance carrier sending copy of the correspondence to David. Then he heard nothing more about the matter for over a year. He was not notified of the taking of the default nor the proceedings to prove the judgment. He was not served with notice that the judgment was taken. Only when an escrow of the sale of his property was opened 14 months later did he become aware of the consequences of his misplaced reliance upon the purchasers of his business. Before that, he could justifiably believe that proper care had been given to the lawsuit.

The foregoing capsule of the facts is typical of a lay person who has no understanding of the law's procedural requirements. We hold lawyers to a stricter degree of responsibility because it is their business to know and respect legal procedures, but it is not to be expected of a person whose experience is limited to the sale of food products.

I prefer that the discretion of the trial court once exercised under these circumstances in favor of setting aside a default not be disturbed.

THOMPSON, C. J., concurs in the dissent.