BRADLEY GILMAN, DVM, APPELLANT, *v.* NEVADA STATE BOARD OF VETERINARY MEDICAL EXAMINERS, RESPONDENT.

No. 37974

May 19, 2004                    89 P.3d 1000

---

[28]76 P.3d at 456.

[29]We have carefully reviewed the Epperson defendants' additional arguments and determine they are without merit.

[Rehearing denied August 26, 2004]

*Law Office of Daniel Marks* and *Adam Levine* and *Daniel Marks,* Las Vegas, for Appellant.

*Brian Sandoval,* Attorney General, *Tina M. Leiss,* Senior Deputy Attorney General, and *Frederick R. Olmstead,* Deputy Attorney General, Carson City, for Respondent.

266

Before AGOSTI, ROSE and MAUPIN, JJ.

## OPINION

By the Court, AGOSTI, J.:

On October 22, 1998, Mr. and Mrs. Slensky took their young beagle, "Gardener," to the Green Valley Animal Hospital for routine vaccinations and for examination because the dog had experienced loose stools for four days. Appellant Bradley Gilman, DVM, asked Mrs. Slensky for permission to x-ray Gardener for an intestinal blockage before vaccinating him. Dr. Gilman did not initially perform a physical examination of the dog because it was snappish and he hoped it would calm down when separated from its owner. Dr. Gilman instructed Greg Krasch, an unlicensed veterinary technician, to take x-rays of Gardener.

Krasch attempted to x-ray Gardener, but the dog struggled extensively. At one point, it hit its head against the table. It also defecated on the table. While Krasch was cleaning up the mess, he tied Gardener to a cage in the room with a slip leash. Gardener struggled against the leash for several minutes, then settled down. Because the dog was so intractable, Dr. Gilman instructed Krasch to wait until he obtained permission from the owners to sedate Gardener. However, after Gardener settled down, Krasch obtained the x-rays without waiting for Gardener to be sedated.

At approximately 5:00 p.m., Mrs. Slensky and her daughter arrived to take Gardener home. When Gardener was brought to them, he took a few steps toward them, then collapsed at their feet and was nonresponsive. Dr. Gilman checked the dog for symptoms of shock. Dr. Gilman initially told the Slenskys to take Gardener home and monitor him, but subsequently told them to take Gardener to the Emergency Animal Center to be monitored by a

veterinarian overnight. Dr. Gilman was emphatic that they take the dog to the Emergency Animal Center immediately, but did not provide any information as to why Gardener was in such a condition. The veterinarian on call at the emergency clinic treated Gardener for shock. Despite her efforts, Gardener died that evening.

The next day, Gardener's blood results showed he had highly elevated liver enzymes known as ALT and AST, which could indicate liver disease. However, the Slenskys declined to have a necropsy done to determine the exact cause of death.

The Slenskys filed a complaint with the Nevada State Board of Veterinary Medical Examiners (the Board), against Dr. Gilman. After an investigation by Gary Ailes, DVM, the Board filed an "Accusation" against Dr. Gilman on August 31, 1999.

On December 13, 1999, the Board held an evidentiary hearing. Both the deputy attorney general and Dr. Gilman presented testimony from expert witnesses who reached opposite conclusions regarding the appropriateness of Dr. Gilman's actions. The Board voted to convict Dr. Gilman of incompetence and gross negligence under NRS 638.140(5), an ethics violation under NAC 638.046 and incompetence under NRS 638.140(5) for the use of an unlicensed veterinary technician. Dr. Gilman's license was suspended for sixty days, and Dr. Gilman was placed on probation for three years. The Board also ordered Dr. Gilman to pay costs and attorney fees in the amount of $18,093. The costs were based on an affidavit submitted by the Board's executive director.

Dr. Gilman timely filed a petition for judicial review, which the district court denied. Dr. Gilman then appealed to this court. We issued an order of limited remand directing the district court to remand the matter to the Board for a determination of whether Dr. Gilman's misconduct was shown by clear and convincing evidence. The Board, at a public meeting, determined that clear and convincing evidence showed that Dr. Gilman had engaged in the alleged misconduct. The determination was transmitted to this court. Subsequently, Dr. Gilman moved to supplement the record with the transcript of the proceeding and points and authorities as to why the proceeding violated his due process rights. The Board opposed the motion. We granted it and allowed Dr. Gilman to supplement the record.

"On review, neither this court nor the district court may substitute its judgment or evaluation of the record developed at the agency level for that of the Board . . . ."[1] Rather, the court must " 'review the evidence presented to the agency in order to deter-

[1]*State, Emp. Sec. Dep't v. Harich Tahoe,* 108 Nev. 175, 177, 825 P.2d 1234, 1236 (1992).

mine whether the agency's decision was arbitrary or capricious and was thus an abuse of the agency's discretion.'"[2] The decision of the agency will be affirmed if substantial evidence exists to support it.[3] Substantial evidence is "that which a reasonable mind might accept as adequate to support a conclusion."[4] Questions of law, however, are reviewed de novo.[5]

Dr. Gilman argues that the Board members who served as triers of fact in his disciplinary hearing were also responsible for the Board's finances and, therefore, could not serve as impartial decision makers because their pecuniary interest created an appearance of bias and tempted them to decide the case in favor of their interest.[6] Dr. Gilman also contends that under NRS 638.1473(2)-(3), any fines recovered from licensees must be deposited in the state general fund to avoid the appearance of bias unless the Board has appointed an independent hearing officer or panel for a disciplinary matter. Dr. Gilman contends that because the Board (1) did not appoint an independent hearing officer, (2) imposed $18,093 in penalties against him to recover its expenses in conducting the hearing, and (3) deposited the monies in the Board's operating fund rather than the state general fund, there was sufficient evidence to create the appearance of bias.

[2]*Secretary of State v. Tretiak,* 117 Nev. 299, 305, 22 P.3d 1134, 1138 (2001) (quoting *Clements v. Airport Authority,* 111 Nev. 717, 721, 896 P.2d 458, 460 (1995)); *see also* NRS 233B.135.

[3]*Harich Tahoe,* 108 Nev. at 177, 825 P.2d at 1236.

[4]*McClanahan v. Raley's, Inc.,* 117 Nev. 921, 924, 34 P.3d 573, 576 (2001) (internal quotation marks and citations omitted).

[5]*Collett Electric v. Dubovik,* 112 Nev. 193, 196, 911 P.2d 1192, 1195 (1996).

[6]*See Ward v. Village of Monroeville,* 409 U.S. 57, 59-62 (1972) (holding that appellant's due process rights were violated where the mayor who adjudicated his case had executive responsibility for the village finances, and fines from his court contributed substantially to the village fisc); *Dugan v. Ohio,* 277 U.S. 61, 65 (1928) (holding that where the mayor's salary was fixed and he had a remote executive relation as one of five city commissioners to the fund to which fines in his court contributed, his pecuniary interest in the outcome of cases before his court was too minute to cause an appearance of bias); *Tumey v. Ohio,* 273 U.S. 510, 532-33 (1927) (holding that appellant's due process rights had been violated where the mayor who convicted him received a portion of the fines imposed and had executive responsibility for the village finances, aided in large part by the mayor's court); *In re Ross,* 99 Nev. 1, 8, 12-15, 656 P.2d 832, 836, 839-40 (1983) (holding that petitioners' due process right to an impartial tribunal had been violated where the disciplinary action was adjudicated by the state bar board of governors, which had executive responsibility for the bar association's finances, and the costs and fines assessed against petitioners would entirely defray the state bar's deficit); *Burleigh v. State Bar of Nevada,* 98 Nev. 140, 144, 643 P.2d 1201, 1203 (1982) (holding that where the panel adjudicating the disciplinary action against appellant received no compensation for their services and were not responsible for the financial integrity of the state bar, appellant's due process right to an impartial tribunal was not violated).

A veterinarian's license to practice is a property interest protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution[7] as well as by Article 1, Section 8 of the Nevada Constitution. The United States Supreme Court has set forth standards for evaluating a tribunal's fairness under the Due Process Clause. "[A] 'fair trial in a fair tribunal is a basic requirement of due process.' This applies to administrative agencies which adjudicate as well as to courts."[8] Not only must the tribunal harbor no actual bias against the person facing a deprivation of his property interests, but " 'justice must satisfy the appearance of justice.' "[9] The test is:

> whether the [adjudicator's] situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused."[10]

A presumption of honesty and integrity cloaks those who serve as adjudicators.[11] That presumption may be overcome, however, by showing that the adjudicators have a conflict of interest, such as a financial stake in the outcome of the case.[12] Here, the executive director and the president of the Board had knowledge of the Board's day-to-day finances, and the other Board members reviewed the quarterly finances, yearly audits and budget requests at Board meetings. Therefore, they did have some fiscal responsibility for the agency.

However, no bias may be inferred if the pecuniary interest is too remote to create a possible temptation to convict.[13] The Board had a $350,000 reserve fund, in addition to its annual budget, which it could access with approval from the Board of Examiners. The costs

---

[7]U.S. Const. amend. XIV, § 1; *see also Minton v. Board of Medical Examiners,* 110 Nev. 1060, 1082, 881 P.2d 1339, 1354 (1994) (stating that "[g]enerally, the right to practice medicine is a property right protected by the due process clauses of the United States and Nevada Constitutions").

[8]*Withrow v. Larkin,* 421 U.S. 35, 46 (1975) (quoting *In re Murchison,* 349 U.S. 133, 136 (1955)).

[9]*Marshall v. Jerrico, Inc.,* 446 U.S. 238, 243 (1980) (quoting *Offutt v. United States,* 348 U.S. 11, 14 (1954)).

[10]*Ward,* 409 U.S. at 60 (quoting *Tumey,* 273 U.S. at 532).

[11]*Withrow,* 421 U.S. at 47.

[12]*Schweiker v. McClure,* 456 U.S. 188, 195 (1982).

[13]*Marshall,* 446 U.S. at 250-52 (holding that sums collected under a reimbursement provision to defray the agency's enforcement costs presented too remote a potential for a conflict of interest).

expended by the Board in Dr. Gilman's case were only approximately five percent of its reserve fund, and less than four percent of the combined annual budget and reserve fund.

Dr. Gilman's reliance on a 1983 decision by this court, *In re Ross,*[14] is misplaced. In *Ross,* we held that where dues were paid directly to the State Bar treasury and the Board of Governors was responsible for the bar association's financial integrity, the board violated the petitioner's due process rights by sitting as the trier of fact in his hearing because doing so "present[ed] a constitutionally unacceptable potential for bias."[15] *Ross* differs from Dr. Gilman's situation in one very important aspect. In *Ross,* the Board of Governors completely absolved the attorneys facing disciplinary charges of all allegations against them. However, the Board found that the attorneys had been untruthful during the investigation. The Board then recommended discipline and imposed costs on that basis. The imposition of costs in that case entirely defrayed the State Bar's yearly budget deficit. Given those facts, we could not say that the Board of Governors was not potentially biased or would not have been tempted to find that the attorneys had engaged in misconduct in order to recover its investigation costs and to cover the State Bar's budgetary deficit. Here, in contrast, the Board had a budgetary surplus of $350,000, in addition to its annual budget. The Board in this case found that all of the allegations against Dr. Gilman were true. There was ample evidence in the record to support the Board's factual findings. Furthermore, while the costs of investigating the allegations against Dr. Gilman were not insignificant, the Board was operating with a substantial budgetary surplus. Given that the Board had access to $350,000 if necessary, it does not appear to us that the Board would have been tempted to find that Dr. Gilman had engaged in misconduct merely to recuperate the costs of investigation and hearing.

Moreover, if we were to forbid the costs of an investigation and hearing simply because a board has minimal budgetary oversight, the agency would not be able to effectively function as a self-policing entity. To cover the costs of investigating cases of alleged professional misconduct, it would either have to increase its membership fees,[16] which could result in pricing people out of the profession, or it would have to appoint an independent hearing officer,[17] which would effectively force every agency to implement an intermediate appeals process. Furthermore, a party upon whom

---

[14]99 Nev. 1, 656 P.2d 832 (1983).

[15]*Id.* at 13, 656 P.2d at 839.

[16]NRS 638.1473(1) mandates that all reasonable expenses incurred by the Board in carrying out its responsibilities under NRS Chapter 638 be paid from monies received from licensees.

[17]NRS 638.1473(3).

costs are imposed may seek judicial review to determine whether the costs imposed were excessive.

Finally, ''costs'' are not ''fines.'' The latter must be turned over to the state general fund in order to avoid the appearance of bias, unless an independent hearing officer is appointed to determine the case.[18] However, the former are merely a recuperation of the expenses necessarily incurred in investigating alleged professional misconduct, a function in which the public has a strong interest, as it is one of the few means by which the public is protected from incompetence. As stated previously, the Board's ability to effectively perform its duty as a self-policing agency would be severely hampered if it were not able to recover the costs of an investigation and hearing.

However, the Board erred by imposing attorney fees on Dr. Gilman. While we will not disturb an award of attorney fees absent an abuse of discretion, it is an abuse of discretion to award attorney fees in the absence of a statutory basis to do so.[19] To determine whether the Board was authorized to assess attorney fees against Dr. Gilman, we must inquire whether the statute allowing the Board to recover costs also allows for the recovery of attorney fees. Construction of a statute is a question of law; therefore, this court conducts de novo review.[20]

> ''It is a well-recognized tenet of statutory construction that multiple legislative provisions be construed as a whole, and where possible, a statute should be read to give plain meaning to all its parts.'' Other words or phrases used in the statute or separate subsections of the statute can be reviewed to determine the meaning and purpose of the statute.[21]

NRS 638.147(10) (repealed 2003) does not provide for the recovery of attorney fees in disciplinary hearings. However, in other parts of NRS Chapter 638, the Legislature has specifically allowed the Board to recover both attorney fees and costs.[22] The Legislature clearly differentiated between costs and attorney fees on two other occasions within the same chapter; the fact that the Legislature failed to include attorney fees in NRS 638.147(10) (repealed 2003) indicates that the Legislature did not intend for the

[18]NRS 638.1473.

[19]*Frantz v. Johnson,* 116 Nev. 455, 471, 999 P.2d 351, 361 (2000).

[20]*A.F. Constr. Co. v. Virgin River Casino,* 118 Nev. 699, 703, 56 P.3d 887, 890 (2002).

[21]*Diamond v. Swick,* 117 Nev. 671, 676, 28 P.3d 1087, 1090 (2001) (quoting *Gaines v. State,* 116 Nev. 359, 365, 998 P.2d 166, 169-70 (2000)).

[22]*See* NRS 638.100(6) (repealed 2003); NRS 638.154 (repealed 2003).

Board to recover attorney fees at the administrative level. Consequently, the Board lacked authority to impose these fees on Dr. Gilman.

Dr. Gilman next asserts that the Board's assessment of "Board Costs" against him was an abuse of discretion. The Board charged him $1,737 for travel, hotel and meals for nine people for two days and per diem and travel expenses for Dr. Bernard Cannon. Additionally, the Board charged him for meals for nine people, including the prosecuting attorney, when there were only five Board members. Dr. Gilman argues that the charges were improper because meals are not an appropriate cost connected to judicial proceedings and because the Board's meals should have been paid out of its per diem allowance.

The Board members are practicing veterinarians who must leave their normal routines to conduct the Board's business, which includes holding disciplinary hearings. They are entitled to a salary and per diem as set forth in NRS 638.040, NRS 281.160 and the regulations adopted by the State Board of Examiners. NRS 638.040(2) also entitles employees of the Board to a per diem allowance and travel expenses. The record reflects that the Board imposed its actual costs, rather than the salary and per diem, for most of its members and employees. Because these actual costs do not exceed the amount that could have been assessed for salaries and per diem allowances, the Board did not abuse its discretion by imposing these costs on Dr. Gilman. However, it was improper for the Board to assess against Dr. Gilman the costs of feeding the prosecuting attorney, as the prosecuting attorney, employed by the Attorney General's Office, is neither a Board member nor an employee. Therefore, the district court's affirmance of "Board Costs" must be reversed as to meals for persons who were not Board members or employees.

Dr. Gilman next argues that the award of $7,145 in expert witness fees was improper under NRS 18.005(5), because it exceeded the limit of $1,500 and was not supported by a determination that the necessity of the expert's testimony justified the fee. While NRS 638.147(10) (repealed 2003) allows the Board to recover its costs in taking disciplinary action against a licensee, there are no other statutes that assist in the interpretation of what costs the Board is authorized to recover. On the other hand, NRS 18.005, which applies to civil practice in district courts, illustrates several types of costs that a prevailing party may recover and sets forth limits upon the recovery of those costs. NRS 18.005(5) limits the recovery of costs for expert witnesses to $1,500 unless the district

court determines that the circumstances warrant a larger fee. NRS 18.005 provides guidance for the recovery of costs, regardless of whether the parties are in district court or before an administrative board. Here, an examination of the hearing transcript shows that the Board's expert witness's testimony constituted most of the evidence against Dr. Gilman. Thus, the Board did not abuse its discretion in allowing these expert witness fees in excess of the cap set forth in NRS 18.005(5).

Dr. Gilman next asserts that the investigation and hearing attendance fees, submitted by Dr. Mike Chumrau, were improper because Dr. Ailes was the investigator on his case and because there are no explanations for the services performed by Dr. Chumrau. With regard to investigation costs at the trial court level, this court has held that, even though a prevailing party submits itemized statements in support of investigation costs, the party must also demonstrate "how such fees were necessary to and incurred in the present action."[23] Without such information, a grant of investigation costs constitutes an abuse of discretion by the trial court.[24] The same standard applies in an administrative hearing. While the Board is not a prevailing party in the same sense as a prevailing party in a civil suit, the same principle that caused the Legislature to allow a prevailing party in a civil suit to recover costs applies to the Board in administrative proceedings. A cost recovery statute allows a prevailing party in a civil suit to recover expenses necessarily incurred in the assertion or defense of his rights in court;[25] here, the cost recovery statute operates to reimburse the Board for expenses necessarily incurred in protecting the public from incompetent, negligent or unprofessional veterinarians. Expenses necessarily incurred in disciplining a veterinarian must, by their very nature, be reasonable;[26] and the Board must show that its costs were both reasonable and actual.[27] Because the reasonableness of the in-

---

[23]*Bobby Berosini, Ltd. v. PETA,* 114 Nev. 1348, 1352-53, 971 P.2d 383, 386 (1998).

[24]*Id.* at 1353, 971 P.2d at 386.

[25]*Reese v. Mandel,* 167 A.2d 111, 116 (Md. 1961).

[26]While NRS 638.147(10) (repealed 2003) allows for the recovery of all costs incurred by the Board in taking disciplinary action against a licensee, such costs must be reasonable; otherwise the Board could impose grossly inflated costs upon a disciplined licensee. *See ACLU v. Blaine School Dist. No. 503,* 975 P.2d 536, 542 (Wash. Ct. App. 1999) (in interpreting Washington's public records act provision allowing the recovery of "all costs," stating that "the plain meaning of the word 'all' logically leads to the conclusion that the drafters of the act intended that the prevailing party could recover all of the reasonable expenses it incurred in gaining access to the requested records").

[27]*Gibellini v. Klindt,* 110 Nev. 1201, 1206, 885 P.2d 540, 543 (1994) (holding that reasonable costs must be "actual costs that are also reasonable,

vestigative costs incurred could not be determined without an explanation of how such costs were necessary to the action, the Board abused its discretion by assessing costs against Dr. Gilman based only on billing statements of Dr. Chumrau, without any explanation of the services provided by him, especially since Dr. Ailes was the investigator on the case. Therefore, the district court erred by denying judicial review on this basis.[28]

Turning from the costs imposed to the standard of review, Dr. Gilman next alleges that the district court erred by applying the substantial evidence standard under NRS 233B.135 to find Dr. Gilman guilty of the charges based on substantial evidence in the record. He asserts that NRS 638.145[29] requires a conviction to be based upon "satisfactory proof," and that this court in *In re Drakulich*[30] defined clear and convincing evidence as satisfactory proof. Therefore, Dr. Gilman contends that the Board had the burden to show by clear and convincing evidence that he was guilty of the charges and that the district court erred by not employing that standard of review. He argues that the Board failed to show by satisfactory proof that he was grossly negligent or incompetent. We agreed, and issued an order of limited remand directing the district court to remand the matter to the Board to determine whether Dr. Gilman's alleged misconduct was proven by clear and convincing evidence. The Board determined that it was.

When a higher standard of proof is set forth in a statute involving license revocation proceedings, that statute supersedes the substantial evidence standard of review set forth at NRS 233B.135(3)(e).[31] And, when the alleged violations must be sup-

rather than a reasonable estimate or calculation of such costs based upon administrative convenience").

[28]We have reviewed the other costs contested by Dr. Gilman and conclude that Dr. Gilman's arguments regarding the excessiveness of those costs are without merit.

[29]NRS 638.145 (2001) (amended 2003) states: "The board shall not refuse to issue a license to an applicant or take any disciplinary action except upon satisfactory proof that the applicant or licensee has engaged in one or more of the practices prohibited by the provisions of this chapter."

[30]111 Nev. 1556, 908 P.2d 709 (1995).

[31]NRS 233B.135(3)(e) provides:

The court shall not substitute its judgment for that of the agency as to the weight of evidence on a question of fact. The court may remand or affirm the final decision or set it aside in whole or in part if substantial rights of the petitioner have been prejudiced because the final decision of the agency is:

. . . .

(e) Clearly erroneous in view of the reliable, probative and substantial evidence on the whole record . . . .

ported by clear and convincing evidence, we review the record and decision "with a degree of deference, seeking only to determine whether the evidence adduced at the hearing was sufficient to have convinced the deciding body that violations had been shown by clear and convincing evidence."[32] The record reveals that the evidence was sufficient to support the Board's determination. Therefore, we affirm the district court's order denying the petition for judicial review in this regard. In so doing, we recognize that the Legislature has since amended NRS 638.145 so that the new standard for the imposition of disciplinary action is a preponderance of the evidence. However, we do not apply this amendment retroactively to Dr. Gilman's case because the Legislature did not clearly show that it intended the statute to apply retroactively, even though it was aware of Dr. Gilman's situation when it amended the statute.[33]

Dr. Gilman next contends that the Board's determination that he had acted incompetently by employing unlicensed veterinary technicians violated the prohibition against ex post facto laws[34] because the statute did not proscribe the use of unlicensed veterinary technicians at the time of the alleged violation. We disagree.

The accusation filed against Dr. Gilman charged him with violating NRS 638.124(2), 638.140(1) and (5), NAC 638.053(4)(h) and (i) and NAC 638.057(2) (1997) for allowing an unlicensed veterinary technician to position an animal for x-rays and to operate an x-ray machine. NAC 638.053(4)(h) and (i) allows a veterinary technician to position animals for x-rays and to operate an x-ray machine. NRS 638.013 (amended 2003) defined a "veterinary technician" as "a person who is formally trained for the specific purpose of assisting a licensed veterinarian in the performance of professional or technical services in the field of veterinary medicine." The statute did not state that veterinary technicians must be licensed. In contrast, NRS 638.005, the statute that defines "euthanasia technician," specifies that such a technician is licensed by

*See also Minton v. Board of Medical Examiners,* 110 Nev. 1060, 1078, 881 P.2d 1339, 1352 (1994) (holding that where a more specific statute sets forth a particular standard of review for assessing factual findings, that standard supersedes the substantial evidence standard provided in the administrative procedure act, and the board's factual findings must be supported by the particular standard).

[32]*Minton,* 110 Nev. at 1079, 881 P.2d at 1352.

[33]*See Castillo v. State,* 110 Nev. 535, 540, 874 P.2d 1252, 1256 (1994), *disapproved on other grounds by Wood v. State,* 111 Nev. 428, 430, 892 P.2d 944, 946 (1995).

[34]U.S. Const. art. I, § 9, cl. 3; Nev. Const. art. 1, § 15.

the Board. Nonetheless, NRS 638.103, NRS 638.122 and NRS 638.123 delineated the requirements and procedure for securing a license as a veterinary technician, and NRS 638.170(3) criminalized practicing as a veterinary technician without a license. Therefore, we conclude that, even though the applicable definition of "veterinary technician" omitted the word "license," the statutory scheme as a whole clearly contemplated that veterinary technicians would be licensed.

Furthermore, NRS 638.1406(2) provided: "The following acts, among others, are grounds for disciplinary action: . . . 2. Having professional association with or employing any person claiming to be a veterinarian or veterinary technician unlawfully." Although the Board, during closed-session deliberations, admitted that it was common practice to employ unlicensed veterinary technicians, the Legislature had made it a ground for disciplinary action. Hence, we conclude that the Board's determination that Dr. Gilman had acted incompetently by employing unlicensed veterinary technicians did not violate the prohibition against ex post facto laws and that there was sufficient evidence to support the Board's determination that clear and convincing evidence showed that Dr. Gilman had violated this proscription.

Finally, Dr. Gilman contends that, at the proceeding at which the Board determined that clear and convincing evidence showed he had engaged in misconduct, the Board violated his due process rights by refusing to allow his counsel to make objections or to point to exculpatory evidence in the record. We conclude that Dr. Gilman's due process rights were not violated. Although the meeting was open to the public, it was quasi-judicial in nature and could have been held outside the presence of Dr. Gilman and his counsel if Dr. Gilman had been provided with proper notice.[35] Furthermore, neither Dr. Gilman nor the deputy attorney general were allowed to point to evidence in the record, either inculpatory or exculpatory. Finally, all of the Board members indicated that they had reviewed the record. Dr. Pennell merely summarized the record for them. Even if his summary may have been inaccurate in parts, we conclude that the Board members, who had all read the record, could disregard any inaccuracies. Dr. Pennell did not impermissibly cross the line into a prosecutorial or adversarial role.[36]

For the foregoing reasons, we affirm the judgment of the district court in part, reverse in part and remand with instructions to the

[35]NRS 241.030; NRS 241.034(1)(a).

[36]NRS 233B.122(1); *see also State, Dep't Mtr. Vehicles v. Thompson,* 102 Nev. 176, 178, 717 P.2d 580, 581 (1986).

district court to remand the matter to the Board of Veterinary Medical Examiners to reassess costs against Dr. Gilman in accordance with this opinion.[37]

ROSE and MAUPIN, JJ., concur.

---

[37]We have reviewed Dr. Gilman's other arguments and conclude they are without merit.